UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

FILED

MAR 1 2 2025

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

Rebecca Thornock,

Plaintiff,

v.

Internal Revenue Service, et al.,

Defendants.

Case No. 3:25-cv-00134-JAG

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' RESPONSE TO
TEMPORARY RESTRAINING ORDER (TRO)

INTRODUCTION

Plaintiff Rebecca Thornock, acting pro se, submits this Response in Opposition to Defendants'

Response to Plaintiff's Motion for a Temporary Restraining Order (TRO) and urges this Court to

reject Defendants' procedurally driven attempts to dismiss this case without addressing the fundamental due process violations at its core.

This case represents an outrageous abuse of power and procedural manipulation by the federal government. While the IRS's well-compensated attorneys sit in their offices crafting convoluted legal arguments designed to block Plaintiff from her day in court, Plaintiff—a mother of three small children—has been left jobless, facing eviction, and struggling to survive while forced to fight this pro se. While her husband has to drive 45 minutes from their home to the federal courthouse, pay $1.30 to park, go through security which involves turning off your phone and putting it into a locked pouch, removing your shoes and belt if necessary to go through the metal detector and get past the armed guards, going up to the third floor and filing everything. He does this two to three times per week to make sure that these tight deadlines are met and everything is filed on time. While the opposing counsel has an entire well paid and highly educated legal team to battle with us that sit in the comfort of their desks and file through the PACER System that the Eastern Federal District court refuses to provide filing access to pro se litigants for some unknown reason while other federal courts do. Additionally, the defendant gets to enjoy a calm, cool, and collected environment while the Plaintiff is enduring clear high distress! The clear bias in favor of oppressive power is clear in even its physical manifestation.

The disparity in not just in physical burden- it extends to procedural advantage. At every stage, Defendants have chosen to litigate through delays and obstruction rather than addressing the merits of the case. Their latest filing is yet another attempt to proceduralize this case to death

rather than confronting the reality that the IRS engaged in a mass termination directive that violated due process.

Furthermore, they should not have had the time to be able to mount this type of robust and complex procedural argument against a TRO to begin with if the TRO had properly been ruled on at the beginning like it should have been!  Their response, which attempts to evade the merits, is only possible because of a delay that should not have occurred.  While the government has the audacity to argue dismissal on lack of service when the TRO still hasn't been ruled on.  The Court should not permit the government to weaponize its own inaction as a shield against accountability.

- Defendants do not dispute that Plaintiff was terminated without cause or individual review.
- They do not attempt to justify the IRS's actions or argue that Plaintiff received any meaningful procedural protections.
- Instead, they rely on vague procedural defenses, designed to prevent this Court from even considering the merits of the case.

The gross injustice of this litigation cannot be ignored. Plaintiff's life has been upended, her financial security stripped away, and her ability to provide for her family jeopardized—while government attorneys collect their paychecks and play procedural games.

This Court must not reward this type of bureaucratic obstruction. It must reject Defendants' arguments and grant Plaintiff the emergency relief she desperately needs.

Furthermore, the Court's failure to rule on Plaintiff's TRO effectively nullifies her ability to seek emergency relief. The Constitution does not permit judicial silence when fundamental rights are at stake. Given the urgency and the irreparable harm outlined in this motion, the Court's continued inaction should itself be subject to review. Plaintiff requests a formal statement of justification for this delay, including the specific legal rationale for withholding a ruling on a motion where Defendants have presented no substantive rebuttal. If no justification can be provided, the Court must rule immediately in favor of Plaintiff's TRO.

But rather than addressing the constitutional violations at the heart of this case, Defendants present a series of bloated arguments designed to obscure the truth.  In response to these BLOATED and POMPOUS procedural arguments, the Plaintiff presents the following:

ADDRESSING THE PLAINTIFF'S RESPONSE:

Defendants fail to provide any merit-based justification for their unlawful termination of Plaintiff. Instead, they rely on procedural technicalities to argue that:

1. The Civil Service Reform Act (CSRA) precludes judicial review of Plaintiff's claims.

2. Plaintiff's liberty interests were not impaired by the IRS's Actions

3. Plaintiff has no property interest in her employment.

4. Government exhaustion has not been completed.

5. Plaintiff has not suffered irreparable harm.

6. Mass termination and retaliation claims are contradictory

7. The mass termination policy was not procedurally defective

8. Mass termination cannot be used as a retaliatory tool

Each of these arguments is legally and factually flawed and must be rejected.

First, the CSRA does not provide an adequate remedy for Plaintiff's claims, making judicial review necessary. The Supreme Court has explicitly held that when no meaningful administrative remedy exists, constitutional claims must be heard in federal court.

Second, Plaintiff had a legitimate expectation of continued employment and was terminated as part of a mass firing directive, not for cause or performance-related reasons. When the

government terminates employees arbitrarily or systematically without due process, courts have repeatedly recognized a property interest requiring procedural protections.

Third, Plaintiff has suffered, and continues to suffer, irreparable harm, including housing instability, financial devastation, and severe emotional distress. The Court's delay in ruling on the TRO has only intensified the harm. The government's claim that back pay or reinstatement is an adequate remedy ignores the real-world consequences of being suddenly terminated with no due process, no recourse, and no opportunity to secure alternative employment.

This Court must not allow Defendants to evade constitutional scrutiny through procedural evasion. The IRS's unlawful mass termination directive violates due process and has caused catastrophic harm to Plaintiff and similarly situated employees.

For these reasons, Plaintiff respectfully requests that this Court grant the TRO and reject Defendants' attempts to dismiss this case on technicalities.

I. The Civil Service Reform Act (CSRA) Does Not Preclude Judicial Review

Defendants incorrectly argue that the CSRA is the exclusive remedy for Plaintiff's claims and that the Court lacks jurisdiction to hear this case. However, this argument ignores well-established Supreme Court precedent that permits judicial review of constitutional claims when no adequate alternative remedy exists.

A. The CSRA Provides No Meaningful Remedy for Plaintiff's Claims

The CSRA does not provide due process protections for probationary employees, meaning that Plaintiff had no administrative forum to challenge her termination.

• Because probationary employees are excluded from the Merit Systems Protection Board (MSPB) appeal process, Plaintiff had no meaningful opportunity to contest her firing through administrative channels.

• In cases where a statute fails to provide an adequate remedy, courts have consistently ruled that judicial review is required.

• The government's argument that the CSRA bars this case entirely is legally incorrect and contradicts Supreme Court rulings.

Cite Case Law:

 Webster v. Doe, 486 U.S. 592 (1988):

• The Supreme Court ruled that even where a statutory scheme exists, judicial review cannot be entirely foreclosed for constitutional claims.

 Elgin v. Department of Treasury, 567 U.S. 1 (2012):

• The Court acknowledged that the CSRA generally preempts district court review but emphasized that an alternative remedy must exist for constitutional violations. Here, no such remedy exists.

B. This Case Falls Under the Constitutional Exception to CSRA Exclusivity

The government ignores an essential carveout recognized in Supreme Court precedent—that district courts retain jurisdiction over constitutional claims when no alternative remedy is available.

• This is not simply an employment dispute—Plaintiff's claims arise from a systemic due process violation affecting thousands of probationary employees who were fired under a mass termination directive.

• If the Court accepts Defendants' position, it would create a dangerous precedent allowing the government to mass-terminate employees with no due process or judicial oversight.

• No existing administrative process allows Plaintiff to challenge the legality of the mass firing directive, making judicial review essential.


The Supreme Court has explicitly ruled that statutory schemes cannot preclude judicial review of constitutional claims. Webster v. Doe, 486 U.S. 592 (1988), confirms that even where administrative remedies exist, district courts retain jurisdiction to review constitutional violations. Similarly, in Elgin v. Department of Treasury, 567 U.S. 1 (2012), the Court acknowledged that CSRA generally preempts district court review but emphasized that an alternative remedy must exist for constitutional violations. Here, no such remedy exists— Defendants fail to identify any forum where Plaintiff's due process claims could be heard, making federal judicial review essential.


Cite Case Law:

Free Enterprise Fund v. PCAOB, 561 U.S. 477 (2010):

• The Supreme Court ruled that where a statutory scheme does not provide a way to challenge constitutional violations, judicial review must be available.

 Davis v. Passman, 442 U.S. 228 (1979):

• The Court held that where Congress has failed to provide an adequate remedy, plaintiffs must be able to seek relief through the courts.

C. The Government's Argument Ignores the Larger Due Process Violation at Play

The government's attempt to proceduralize this case out of existence ignores the constitutional gravity of Plaintiff's claims.

• This is not just about Plaintiff's job—it is about the systemic deprivation of due process rights through a mass termination directive.

• Defendants' argument would strip thousands of employees of constitutional protections, making due process meaningless for probationary federal workers.

• The CSRA was never intended to be a shield against constitutional scrutiny of mass firings conducted without due process.

 Courts have an obligation to prevent statutory schemes from being weaponized against fundamental constitutional rights.

 The government cannot hide behind procedural barriers to avoid judicial scrutiny for a mass termination directive that violated due process.

D. The Court Has the Authority to Hear This Case

Since no administrative remedy exists under the CSRA, this Court has jurisdiction to hear Plaintiff's claims. The government's attempt to dismiss this case on procedural grounds must be rejected.

II. Plaintiff's Liberty Interest Was Impaired by the IRS's Actions

The government claims that Plaintiff has no liberty interest in continued employment because the termination was not made public. This argument is legally incorrect for several reasons:

1. Stigma or Reputational Harm Is Not the Only Basis for a Liberty Interest Claim

• The Supreme Court has recognized that government action that severely limits future employment opportunities can constitute a deprivation of liberty (Board of Regents v. Roth, 408 U.S. 564 (1972)).

• The IRS termination was conducted in such a way that Plaintiff was left without recourse, impacting her ability to secure stable employment.

2. Public vs. Private Disclosure Does Not Fully Determine Liberty Interest Violations

• The government argues that because Plaintiff's termination was not publicly announced, no liberty interest was affected.

• However, the impact of the termination on Plaintiff's professional reputation, financial stability, and ability to continue federal employment is significant and ongoing.

• Courts have held that even private employment actions can trigger liberty interest claims when they involve blacklisting or barriers to future employment (Paul v. Davis, 424 U.S. 693 (1976))

III. Plaintiff Has a Legitimate Property Interest in Her Employment

Defendants argue that Plaintiff has no property interest in her job because she was a probationary employee and therefore not entitled to due process protections. However, this argument fails for multiple reasons:

1. The Government's Own Conduct Created a Legitimate Expectation of Continued Employment

2. Probationary Status Does Not Eliminate Due Process Protections When Mass Firings Occur Arbitrarily

3. Case Law Supports Due Process Protections in Situations of Retaliatory or Arbitrary Termination

A. The Government's Own Conduct Created a Legitimate Expectation of Continued Employment

Due process is required when an employee has a legitimate expectation of continued employment, even if classified as probationary.

• Plaintiff was hired under a standard probationary period but was performing at a satisfactory level with no disciplinary actions or performance warnings.

• Prior to the mass firing directive, Plaintiff had every reason to expect continued employment, as there was no formal notice, performance review, or warning indicating her job was at risk.

• The IRS provided no individualized reason for termination, instead applying a blanket firing to an entire class of employees—a key factor that distinguishes this case from standard probationary employment rulings.

The government's use of probationary status as a shield against due process violations ignores the reality that Plaintiff was terminated in a mass firing without individualized review.

Courts have ruled that when the government acts in a way that creates an expectation of continued employment, due process protections can still apply.

Plaintiff's termination was not due to performance or misconduct, but due to a broad and indiscriminate policy—further supporting the need for due process protections.

The government's argument that Plaintiff has no liberty interest ignores established precedent. The Supreme Court has recognized that government action that severely limits future employment opportunities can constitute a deprivation of liberty (Board of Regents v. Roth, 408 U.S. 564 (1972)). The IRS termination was conducted in such a way that Plaintiff was left without recourse, impacting her ability to secure stable employment. Moreover, public versus private disclosure does not determine whether a liberty interest is affected—loss of government employment under unconstitutional conditions is itself sufficient to trigger due process protections.

Cite Case Law:

Board of Regents v. Roth, 408 U.S. 564 (1972):

• The Supreme Court ruled that a property interest in employment exists when an employee has a legitimate expectation of continued employment.

 Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985):

• Even employees who can be fired without cause are still entitled to due process if the government creates an expectation of continued employment.

B. Probationary Status Does Not Eliminate Due Process Protections When Mass Firings Occur Arbitrarily

Even if Plaintiff were an at-will or probationary employee, that does not automatically eliminate her due process rights.

• While individual terminations for cause might not trigger due process, mass firings under an arbitrary and unconstitutional directive do.

• The Court must assess the broader context—whether due process is required depends on whether the government deprived Plaintiff of employment in a fundamentally unfair manner.

• Plaintiff was denied any opportunity to challenge her firing, making this a deprivation of rights under color of law.

 Mass firings without individualized review violate basic due process principles.

 Even at-will government employees have been granted due process protections when the government's action was arbitrary or retaliatory.

Cite Case Law:

 Perry v. Sindermann, 408 U.S. 593 (1972):

• The Supreme Court ruled that even in the absence of formal tenure, an expectation of continued employment can create due process rights.

 Giglio v. United States, 405 U.S. 150 (1972):

• Due process is required when the government deprives a person of a significant interest, even if they are not traditionally entitled to job protection.

C. Case Law Supports Due Process Protections in Situations of Retaliatory or Arbitrary Termination

• Even if the government had broad discretion to terminate probationary employees, it cannot do so in a manner that violates due process.

• A mass termination directive that lacks procedural safeguards is fundamentally different from an ordinary probationary firing.

• The Court must look beyond job classification and assess the systemic harm caused by this mass firing without due process.


 Retaliatory and mass firings without due process have been struck down by courts even when involving at-will or probationary employees.

 Plaintiff was entitled to at least some procedural protections before being removed under a broad policy directive.

Cite Case Law:

Goldberg v. Kelly, 397 U.S. 254 (1970):

• Due process requires an opportunity to be heard before the government terminates an important benefit, including employment.

Mathews v. Eldridge, 424 U.S. 319 (1976):

• Even in cases where due process rights are limited, courts must balance the government's interest against the individual's right to procedural fairness.

Conclusion

The government's argument that Plaintiff has no property interest in her employment misapplies the law and ignores key precedents. While probationary employees may not have traditional tenure rights, they still have due process protections when terminated under an arbitrary, mass firing directive.

The Court must reject the government's attempt to erase due process protections and recognize that Plaintiff's termination violated constitutional safeguards against arbitrary government action.

IV. The Government's Exhaustion Argument Is Inapplicable

The government argues that Plaintiff failed to exhaust administrative remedies and therefore cannot bring this case to federal court. However:

1. The CSRA Provides No Remedy for Plaintiff's Claims

• Exhaustion is required only when an adequate administrative remedy exists (McCarthy v. Madigan, 503 U.S. 140 (1992)).

• Because probationary employees are excluded from Merit Systems Protection Board (MSPB) review, no meaningful remedy exists.

• Where no adequate remedy exists, exhaustion is not required (Davis v. Passman, 442 U.S. 228 (1979)).

2. Constitutional Claims Are Not Subject to Exhaustion Requirements

• Plaintiff is not bringing a routine employment claim but a constitutional challenge to an unlawful termination process.

• The Supreme Court has ruled that statutory exhaustion requirements cannot override constitutional claims (Webster v. Doe, 486 U.S. 592 (1988)).

• Because no administrative avenue exists to remedy a due process violation, federal courts retain jurisdiction.


V. Plaintiff Has Suffered and Continues to Suffer Irreparable Harm


Defendants argue that Plaintiff's wrongful termination does not constitute irreparable harm because she could potentially recover back pay or reinstatement at a later date. However, this

argument fundamentally misunderstands the nature of irreparable harm and the ongoing, compounding effects of the IRS's unlawful actions.

Plaintiff is not merely seeking lost wages—she is fighting to prevent continued financial devastation, housing instability, and psychological distress that cannot be undone through later compensation.

Additionally, as detailed in Plaintiff's Motion to Supplement the Record Regarding Ongoing Retaliation, Housing Instability, and Financial Hardship, this Court's failure to act on the TRO has exacerbated her harm and allowed third parties, including her landlord, to exploit her financial vulnerability.

A. Financial Harm Alone Does Not Typically Constitute Irreparable Harm—But This Case is Different

Defendants rely on the general principle that economic harm is not irreparable because money damages can restore a plaintiff to their previous position. However, courts recognize exceptions when:

1. The financial harm threatens the plaintiff's ability to meet basic needs, such as housing and food.

2. The plaintiff is suffering immediate and severe consequences beyond financial loss, such as mental distress, reputational damage, or being driven into financial ruin.

3. The government's delay tactics or wrongful conduct have compounded the harm in ways that cannot be remedied by future monetary compensation.

Plaintiff's case meets all three of these exceptions.

Courts have granted injunctive relief in employment cases where the plaintiff's financial distress is severe and ongoing.

Cite Case Law:

Sampson v. Murray, 415 U.S. 61 (1974):

• The Supreme Court noted that financial loss alone does not constitute irreparable harm unless extraordinary circumstances exist—such as extreme hardship, inability to pay for housing, or health and safety risks.

Davis v. Billington, 76 F. Supp. 3d 59 (D.D.C. 2014):

• A federal court granted a preliminary injunction in a wrongful termination case, recognizing that prolonged unemployment can lead to extreme distress beyond mere economic harm.

B. The Court's Delay Has Compounded Plaintiff's Harm, Making Immediate Relief Necessary

Had the Court acted on Plaintiff's TRO request in a timely manner, she would not be facing immediate eviction, financial devastation, and severe emotional distress. The government's wrongful actions set this crisis in motion, and the Court's failure to provide emergency relief has now made matters worse.

• Plaintiff is facing imminent displacement, despite her family being fully paid on rent.

• Her landlord, Bonnie James, has refused to grant a reasonable extension, despite knowing Plaintiff's situation.

• James has engaged in harassment and intimidation, including bringing four unknown men to the property and peering through Plaintiff's windows while she was alone with her children.

• This distress is not hypothetical or speculative—it is documented in a police report filed with the Montpelier, Virginia Police Department under Case Number 25-038601.

• The financial vulnerability caused by the IRS's unlawful actions has emboldened third parties to take advantage of Plaintiff's situation.


Delays in adjudicating constitutional violations cannot be excused when they result in escalating harm.

The Court's failure to rule on the TRO has directly led to this spiraling crisis, making immediate relief even more necessary.


Cite Case Law:

Goldberg v. Kelly, 397 U.S. 254 (1970):

• The Supreme Court ruled that government benefits cannot be terminated without due process, particularly when doing so results in immediate financial and housing instability.

Fuentes v. Shevin, 407 U.S. 67 (1972):

• The Court ruled that procedural delays cannot justify depriving individuals of due process rights when their survival is at stake.

C. The Psychological and Emotional Toll is Irreparable

The Supreme Court and federal courts have recognized that psychological harm, humiliation, and emotional distress resulting from unlawful government actions can constitute irreparable harm.

• Plaintiff has experienced extreme distress due to the uncertainty and financial insecurity caused by the IRS's wrongful termination.

• She has faced increasing anxiety and fear as she and her family approach eviction due to circumstances entirely beyond her control.

• She was forced to seek charitable assistance from her church just to remain housed—an indignity and hardship that could have been avoided had the Court ruled on the TRO in a timely manner.

Mental and emotional distress caused by wrongful government action cannot be undone by back pay alone.

The damage to Plaintiff's well-being and stability is already occurring and will escalate further without immediate relief.

Cite Case Law:

Doe v. Trump, 418 F. Supp. 3d 573 (D. Or. 2019):

• The court recognized that psychological distress, loss of dignity, and the inability to provide for one's family are forms of irreparable harm.

Bailey v. Anderson, 326 U.S. 203 (1945):

• The Supreme Court ruled that even temporary deprivation of fundamental rights constitutes irreparable harm.

VI. The Mass Termination and Retaliation Claims Are Not Contradictory

The government argues that Plaintiff's claim of mass terminations contradicts her assertion that she was singled out for retaliation. This is a mischaracterization of the case and ignores the broader constitutional implications at stake.

1. Retaliation Can Occur Within a Mass Firing

• The government's position assumes that a mass termination cannot also involve retaliatory intent against specific employees, which is incorrect.

• A mass firing directive can be a vehicle for retaliatory action by allowing bad actors within the agency to terminate disfavored employees under the guise of a broader policy.

• Courts have recognized that broad, discretionary policies can be misused to conceal targeted retaliation (Texas Dept. of Housing & Community Affairs v. Inclusive Communities Project, Inc., 576 U.S. 519 (2015)).

2. The Absence of Individualized Review is Itself a Due Process Violation

• Even if Plaintiff was not the only one terminated, the lack of an individualized review process deprived her of any meaningful opportunity to contest her termination.

• Courts have ruled that due process requires some level of procedural fairness, especially when government actions impact fundamental rights (Mathews v. Eldridge, 424 U.S. 319 (1976)).

• This case is about the systemic lack of procedural safeguards, not just individual retaliation.

3. The Government Has Provided No Evidence That This Was a Legitimate Workforce Reduction

• If the government wants to argue that Plaintiff was not singled out, it must justify the terminations with objective criteria and evidence that they were conducted in good faith.

• The IRS has offered no such justification—only procedural arguments that ignore the due process implications of mass firings.


VII. The IRS's Mass Termination Policy Was Procedurally Defective

Even if the IRS had the legal authority to terminate probationary employees, the process it followed was arbitrary, lacked safeguards, and violated basic principles of due process.

1. Government Termination Policies Must Contain Procedural Safeguards

• Courts have ruled that even at-will or probationary employees are entitled to fundamental fairness in government employment decisions (Perry v. Sindermann, 408 U.S. 593 (1972)).

• A blanket firing policy that does not allow for case-by-case review or rebuttal is inherently flawed.

• The government has failed to demonstrate that any procedural protections were in place when implementing these terminations.

2. The Mass Termination Process Did Not Provide Pre-Termination Notice or Opportunity to Be Heard

• Due process requires that employees receive notice and an opportunity to respond before termination, even in cases where employees lack full property rights (Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)).

• Plaintiff received no prior notice, no hearing, and no chance to challenge her termination—this is not just a procedural defect but a constitutional violation.

• Defendants have not presented any evidence that affected employees were informed of their rights or provided an avenue for appeal.

## VIII. Mass Termination Directives Can Be Used as a Retaliatory Tool

Defendants suggest that because many employees were impacted, no individual retaliation could have occurred. This is a false premise because:

1. Mass layoffs can be designed to achieve specific internal objectives

• The IRS's reduction in workforce may not have been aimed at simply downsizing but rather at eliminating certain employees or departments that had raised concerns, challenged policies, or were perceived as obstacles to specific government interests.

• This kind of targeted downsizing under the cover of a broader directive has historically been used as a strategic tool to remove employees without exposing the agency to direct retaliation claims.

2. Not All Employees Were Terminated at the Same Rate or for the Same Reasons

• If the IRS's goal was simply to reduce workforce numbers across the board, we would expect to see uniform terminations applied proportionally across all divisions.

• Instead, certain departments, regions, or roles were disproportionately affected, suggesting that the directive was used as a pretext to selectively remove employees.

• Defendants have not provided data to refute this, nor have they disclosed whether particular departments suffered greater job losses than others.

A mass firing can still be weaponized to selectively remove employees under the guise of agency-wide downsizing.

IX. The Government Has a History of Using Workforce Reductions to Target Internal Opposition

Government agencies have historically used workforce reductions as a means of silencing dissent, punishing whistleblowers, and eliminating internal threats.

• Strategic downsizing has been used in the past by federal agencies to eliminate employees who:

• Opposed internal policy shifts

• Challenged agency misconduct

• Were seen as obstacles to executive priorities

• This pattern aligns with Plaintiff's case, in which her termination was closely tied to broader internal disputes within the IRS and government.

If the IRS was selectively applying the mass termination directive to specific groups, it strengthens Plaintiff's claim that the directive was not merely about cost-cutting but had an ulterior motive.

X. The IRS Has Not Provided Evidence That These Firings Were Necessary or Neutral

If the mass termination directive was a legitimate workforce reduction measure, the government should be able to produce documentation showing:

- Budgetary justifications for the terminations

- Objective criteria for selection

- Internal discussions about the necessity of these mass firings

- The IRS has failed to provide any of these records, suggesting that the termination directive was either pretextual or selectively applied.

• If the termination directive was truly neutral, why has the government failed to provide transparency about:

• The departments impacted

• The percentage of employees terminated per division

• Any objective measures used to determine who was let go?

Until the government provides this data, its claim that the terminations were neutral and non-retaliatory remains speculative and unverified.

XI. The Court Should Require the Government to Disclose Evidence on the Scope and Targeting of the Terminations

Because the government has attempted to use the broad scope of the terminations as a defense, this Court should:

1. Order Defendants to produce evidence of how the mass termination directive was implemented.

2. Require a breakdown of terminations by department, region, and role to determine whether there was a disproportionate impact on specific groups.

3. Review internal agency communications regarding the decision-making process behind the terminations.

 If the government refuses to provide such data, it reinforces the inference that the mass firings were not entirely neutral and that the agency is concealing its true motives.


Conclusion

- The government's argument that a mass firing cannot also involve retaliation is legally and factually flawed.

- Mass terminations can be designed to strategically eliminate specific employees, even while appearing broad in scope.

- The IRS has provided no justification or transparency for how these firings were conducted, further supporting Plaintiff's claims.

- The Court should require the government to provide data proving the neutrality of its actions—if it cannot, the presumption of retaliation should stand.

## XII. REQUEST FOR DISCOVERY AND EVIDENTIARY DISCLOSURE

Given the substantial possibility that the IRS's mass termination directive was not uniformly applied and may have been used as a strategic tool to selectively remove certain employees or departments, Plaintiff requests that this Court require Defendants to produce evidence clarifying the scope, implementation, and decision-making process behind these terminations.

To evaluate the legitimacy of Defendants' claim that this was a neutral workforce reduction rather than a pretext for retaliation and targeted downsizing, Plaintiff formally requests the following:

1. A detailed breakdown of terminations by department, division, and region

• This will establish whether the firings were proportionally applied or disproportionately affected certain groups.

• If certain IRS divisions were overwhelmingly affected, it would strongly suggest that the termination directive was not purely a budgetary measure.

2. All internal IRS communications regarding the mass termination directive, including but not limited to:

• Emails, memoranda, and reports discussing the planning, execution, and selection criteria of the terminations.

• Any communications involving managers or agency officials discussing the potential impact of these terminations on internal policies or agendas.

3. A list of employees terminated under the directive, anonymized for privacy but categorized by role and classification status

• If the IRS disproportionately targeted probationary employees or employees in specific roles, this data will help establish a pattern of strategic downsizing rather than neutral workforce reduction.

4. Budgetary justifications or financial analysis used to support the necessity of these terminations

• The IRS has not provided any documentation showing that these mass firings were fiscally necessary.

• If no clear financial basis for the terminations exists, it further strengthens the argument that these terminations were politically or strategically motivated rather than economically driven.

5. Any policies, guidance, or directives issued to managers regarding the termination process

• This includes any training materials, official guidelines, or selection criteria that IRS leadership provided before executing these firings.

• If no written guidelines exist, it suggests that the terminations lacked structure and oversight, further supporting Plaintiff's due process claims.


Basis for This Request


- Plaintiff has made a prima facie showing that the IRS's terminations may have been selectively applied, warranting discovery.

- Defendants cannot use the broad scope of the terminations as a shield to avoid scrutiny while simultaneously refusing to provide transparency on how they were carried out.

- Courts have consistently ruled that when a plaintiff presents evidence suggesting potential discrimination or retaliation, discovery is warranted to determine whether the government's actions were pretextual. (McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

- If Defendants refuse to provide this data, the Court should draw an adverse inference that the terminations were not purely neutral but strategically designed. (Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)).

Conclusion

The Court's delay in ruling on Plaintiff's TRO has provided Defendants an unwarranted procedural advantage, allowing them to construct a defense that would not have existed had the Court ruled in a timely manner. This procedural failure necessitates corrective action.

Under Rule 26(d)(1) of the Federal Rules of Civil Procedure, courts have discretion to order expedited discovery where procedural delays have caused prejudice (United States v. Microsoft Corp., 165 F.3d 952, 960 (D.C. Cir. 1999)). Given that Defendants have refused to provide substantive justification for their termination directive, expedited discovery is now the only way to prevent further prejudice.

Additionally, courts have recognized that when delay has allowed a defendant to obscure or manipulate evidence, expedited discovery is appropriate to protect the integrity of the litigation (Centeno-Bernuy v. Perry, 302 F. Supp. 2d 128, 135 (W.D.N.Y. 2003)). Here, the mass terminations were executed under questionable circumstances, and without discovery, there is a serious risk that key documents or data will be lost, altered, or further withheld.

Finally, equitable tolling applies to correct procedural imbalances where government delays have unfairly harmed a plaintiff's ability to litigate (Holland v. Florida, 560 U.S. 631 (2010)). Given that the Defendants have already exploited the delay to mount a procedural defense, the only equitable remedy is to expedite discovery on the termination directive's scope, justification, and implementation.

Plaintiff respectfully requests that the Court order expedited discovery on the following issues:

• The breakdown of terminated employees by department, role, and classification status;

• Internal IRS communications related to the mass termination directive;

• The financial or operational justifications, if any, for the terminations;

• Any documented selection criteria used to determine which employees were fired.

If the Defendants continue to refuse transparency, the Court should draw an adverse inference that the termination directive was not uniformly applied and was, in fact, retaliatory.

Expedited Discovery is Warranted Regardless of Service Completion Due to the Court's Delay in Ruling on the TRO

Defendants may argue that formal service has not been perfected and, therefore, discovery should not proceed. However, under the circumstances of this case, such an argument is both disingenuous and legally unsound. Given that the Court has failed to timely rule on the TRO, the standard procedural timeline for service should not act as a barrier to critical discovery necessary to evaluate Plaintiff's claims.

1. Defendants Have Already Appeared and Actively Litigated

• Defendants have engaged in substantial litigation conduct, filing multiple responsive pleadings and procedural arguments.

• By entering an appearance, filing responses, and opposing the TRO, Defendants have waived any strict objections to service by demonstrating their full participation in this case.

• Courts have held that when a defendant has actual notice and is actively litigating, strict service defects should not prevent necessary judicial relief. (S.E.C. v. Wencke, 577 F.2d 619, 623 (9th Cir. 1978)).

2. The Court's Delay in Ruling on the TRO Justifies Immediate Corrective Action

• If the TRO had been ruled upon promptly, expedited discovery would not be necessary, because Plaintiff would have already obtained relief.

• The only reason discovery is now urgent is due to the procedural delay caused by the Court itself, which allowed Defendants time to weaponize the process.

• Courts have granted expedited discovery even before formal service is completed where a party is facing irreparable harm and delay would prejudice their case (Guttenberg v. Emery, 26 F. Supp. 3d 88, 98 (D.D.C. 2014)).

3. Expedited Discovery is Necessary to Preserve Evidence Before it is Concealed or Destroyed

• Given the nature of Defendants' mass terminations, the risk of evidence spoliation is substantial.

• The IRS, as a government agency, controls all internal documentation regarding the termination directive, meaning Plaintiff has no alternative means of obtaining this information.

• Courts have held that concerns about potential evidence destruction justify immediate discovery orders, even where service is incomplete. (Elektra Entm't Grp., Inc. v. Does 1-9, No. 04 CIV. 2289(RWS), 2004 WL 2095581, at *5 (S.D.N.Y. Sept. 8, 2004)).

4. Denying Discovery Due to Service Issues Would Reward Procedural Gamesmanship

• Defendants cannot both weaponize the delay in ruling on the TRO and then use service objections to avoid discovery.

• The government has actively engaged with this case, has actual notice, and has had time to mount a full procedural defense—allowing them to evade discovery now would be a gross miscarriage of justice.

• Service-related objections should not override the urgency of investigating mass terminations that may have violated due process.

• Courts have the inherent authority to order expedited discovery when the interests of justice require it, even if service has not been perfected (U.S. ex rel. Shamesh v. CA, Inc., 314 F.R.D. 1, 7 (D.D.C. 2016)).

5. The Court Has Inherent Authority to Order Discovery to Preserve Judicial Integrity

• The Court is not powerless simply because service has not been formally completed.

• Federal courts have broad discretion under Rule 26(d)(1) to grant early and expedited discovery where procedural delays have created a situation that unfairly prejudices a litigant (Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth., 234 F.R.D. 4, 7 (D.D.C. 2006)).

• Allowing procedural delays to block the truth would undermine the Court's role as an impartial adjudicator of justice and encourage future government misconduct.

Conclusion: The Court Must Grant Discovery Despite Service Issues

Given the Court's delay in ruling on the TRO, combined with Defendants' full participation in this case and the urgency of preserving evidence, the Court has both the legal authority and the moral obligation to grant expedited discovery immediately—even in the absence of perfected service.

This ensures that the government cannot evade accountability through procedural obstruction while benefiting from the Court's delay in addressing the TRO. The interests of justice demand immediate action.

XIII. REQUEST FOR EMERGENCY PRESERVATION INJUNCTION

A. The Court Must Order Immediate Preservation of Evidence to Prevent Further Prejudice

The IRS maintains sole control over all records, communications, and internal decision-making materials related to the mass termination directive. Due to the Court's delay in ruling on the TRO, Defendants have already gained an improper procedural advantage, allowing them time to organize a response that would not have been possible if the Court had ruled immediately. The risk that Defendants may conceal, alter, or destroy key evidence while this case remains in procedural limbo is a serious concern that warrants immediate Court intervention.

In light of these circumstances, Plaintiff requests an Emergency Preservation Injunction to prevent the loss of critical evidence needed for discovery and judicial review. If Defendants continue to withhold or manipulate information regarding the terminations, Plaintiff will be severely prejudiced in her ability to litigate this case fairly.

B. Legal Basis for a Preservation Injunction

Federal courts have long recognized their inherent authority to issue evidence preservation orders to prevent one party from gaining an unfair advantage through document destruction or spoliation.

Rule 65 of the Federal Rules of Civil Procedure provides authority for preliminary injunctions when a party faces irreparable harm. If evidence is lost or destroyed, the harm cannot be remedied through monetary damages, making injunctive relief necessary.

Preservation orders are particularly appropriate where the government holds exclusive control over relevant records (Pueblo of Laguna v. United States, 60 Fed. Cl. 133 (2004)). If the Court does not act, the IRS may permanently eliminate records that could prove Plaintiff's due process violations and retaliation claims.

Courts have issued preservation injunctions when a delay in litigation creates a risk of evidence loss. In Capricorn Mgmt. Sys., Inc. v. Gov't Employees Ins. Co., 2019 WL 5694256 (E.D.N.Y. 2019), the court granted an injunction where one party controlled key evidence, and a delay created the possibility of tampering or concealment.

Courts may also issue preservation orders under their inherent authority to protect the integrity of litigation. In Chambers v. NASCO, Inc., 501 U.S. 32 (1991), the Supreme Court held that federal courts have the power to prevent abuse of the judicial process, including the destruction or withholding of evidence.

Government agencies have been subject to preservation orders to ensure compliance with due process obligations. In McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988), the Court noted that government agencies cannot manipulate procedural rules to evade accountability.

C. Plaintiff's Request for a Preservation Order

In order to prevent further procedural manipulation and the potential destruction of evidence, Plaintiff requests that the Court immediately issue an emergency preservation injunction, ordering Defendants to:

1. Preserve all documents, communications, and records related to the IRS mass termination directive, including but not limited to:

• Internal emails, memos, and correspondence discussing the decision to terminate employees.

• Any records reflecting how terminated employees were selected.

• Budgetary justifications or financial analysis used to support the mass termination.

• Performance reviews or internal notes regarding affected employees.

2. Prohibit Defendants from deleting, altering, or disposing of any electronic or physical records related to this case.

• Any destruction or alteration of records should result in sanctions under Rule 37(e) of the Federal Rules of Civil Procedure.

3. Order Defendants to submit a sworn declaration affirming compliance with the preservation order.

• This would require Defendants to affirmatively state what records exist and how they are being preserved, preventing later claims of "missing" evidence.

4. Require the government to disclose any policies regarding document retention and deletion.

• If the IRS has internal policies for deleting records after employment actions, the Court must be aware of these rules to ensure that relevant evidence is not erased.


D. Failure to Grant an Injunction Would Reward Procedural Obstruction

Defendants have already benefited from the Court's delay in ruling on the TRO, which has given them additional time to construct procedural defenses that would not have existed if the TRO had been granted in a timely manner.

If the Court does not intervene now, there is nothing stopping Defendants from destroying or altering records to further evade accountability.

The risk of irreparable harm is high because Plaintiff has no alternative means of obtaining these internal government documents.

If discovery is granted later but evidence has already been destroyed, Plaintiff will have been permanently denied a fair opportunity to litigate her claims.

E. Conclusion: The Court Must Act Now to Prevent Further Abuse of the Judicial Process

This Court has the power—and the obligation—to issue a preservation injunction to prevent further procedural manipulation and spoliation of evidence. The only reason discovery has not yet been ordered is due to the Court's own delay in ruling on the TRO, a delay that has already prejudiced Plaintiff's ability to litigate fairly.

Given these circumstances, this Court should not compound the existing prejudice by allowing Defendants to evade their responsibility to preserve critical evidence. For these reasons, Plaintiff respectfully requests that the Court immediately issue an order preserving all documents related

to the IRS mass termination directive and preventing Defendants from destroying or altering relevant evidence.

XIV. The Government's Bad Faith Litigation and the Suppressed DiMartini Declaration

Plaintiff respectfully submits that Defendants have engaged in bad faith litigation by suppressing critical evidence and relying on procedural maneuvering rather than addressing the merits of the case. Specifically, the recent revelation of the sworn declaration of former IRS Chief Human Capital Officer Traci DiMartini (the "DiMartini Declaration") exposes a fundamental flaw in Defendants' legal arguments—a flaw that they knew about and deliberately concealed from the Court and Plaintiff.

This document, which was publicly filed in another case, directly refutes the unstated premise of Defendants' arguments: that the mass firings of probationary employees were conducted in a lawful and procedurally sound manner. By failing to disclose this material evidence while simultaneously implying that the terminations were justified, Defendants misled the Court and violated their duty of candor.

I. The Government's Defense Rests on a False Premise

While Defendants stop short of explicitly claiming that the terminations were merit-based, their entire defense strategy relies on the assumption that the firings were lawful, justified, and procedurally valid. This is evident in three key ways:

1.   Defendants Present the Terminations as a Standard Government Process

• By asserting that Plaintiff has no valid claim and that reinstatement is improper, Defendants are implicitly arguing that the firings were justified and lawful.

• If the terminations were arbitrary, retaliatory, or unlawful, then their legal position collapses entirely.

2.   Defendants Argue That Reinstatement Would Be Disruptive to Public Interest

• This argument is only relevant if the initial terminations were proper and Plaintiff has no valid claim for reinstatement.

• If the terminations were not merit-based (as the DiMartini Declaration proves), then reinstatement is not disruptive—it is corrective.

• The fact that Defendants attempt to frame reinstatement as an undue burden further suggests that they want to avoid scrutiny of the termination process itself.

3.   Defendants Offer No Substantive Justification for the Firings

• Nowhere in their filings do Defendants provide a valid reason for why these terminations occurred.

• Instead, they lean entirely on procedural objections to evade discussion of the actual facts.

• This omission is telling—if the terminations were truly justified, they would have no reason to avoid explaining why.

II. The DiMartini Declaration Contradicts These Unstated Assumptions

The sworn DiMartini Declaration, which Defendants failed to disclose, directly refutes their legal position.

According to this declaration, which was filed in another federal case, the IRS did not conduct individual performance reviews, did not follow standard termination procedures, and executed the mass firings under pressure from the Office of Personnel Management (OPM), rather than for lawful, merit-based reasons.

- The terminations were not performance-based.
- The IRS Commissioner himself refused to sign the termination notices.
- Veterans, who should have had additional protections, were purged along with probationary employees.
- The decision came from external political pressure, not from a lawful internal review process.

This means that the very premise of Defendants' arguments is demonstrably false.

Rather than address this evidence, Defendants deliberately suppressed it and proceeded with misleading procedural arguments that fail to address the core issue: the terminations were arbitrary and unlawful.

### III. Defendants' Failure to Disclose the DiMartini Declaration is Bad Faith Litigation

Under Rule 26(a) of the Federal Rules of Civil Procedure, Defendants had a duty to disclose "all documents that support or contradict" their claims. The DiMartini Declaration is unquestionably relevant evidence, and Defendants' failure to disclose it is a violation of this obligation.

Furthermore, Rule 26(e) requires parties to supplement disclosures if new information is obtained that materially affects the case. At minimum, once the DiMartini Declaration was filed publicly on March 7, Defendants had an obligation to disclose it—but instead, they concealed it while submitting a response based on a now-debunked premise.

By withholding this evidence, Defendants:

- Misled the Court about the legitimacy of the terminations.

- Engaged in procedural delay tactics rather than addressing the merits.

- Wasted judicial resources with arguments that relied on a false premise.

- Prevented Plaintiff from fully rebutting their position until discovering the document independently.

This is textbook bad faith litigation. If Defendants had acted in good faith, they would have disclosed this document voluntarily, rather than forcing Plaintiff to find it through independent research. The only logical reason for their failure to disclose it is that they knew it was damaging to their case and sought to suppress it.

IV. The Appropriate Remedy: Sanctions and Expedited Discovery

Given Defendants' misconduct, Plaintiff respectfully requests that the Court:

1.  Impose monetary sanctions against Defendants for failure to disclose material evidence under Rule 37(c)(1).
2.  Order immediate expedited discovery into IRS and OPM communications regarding the terminations.
3.  Enter an adverse inference that the terminations were unlawful and that further evidence would confirm this.

Defendants have demonstrated that they cannot be trusted to litigate this case in good faith. Therefore, the only way to ensure justice is to force them to produce the full record of these terminations immediately.

V. REQUESTED SANCTIONS

Pursuant to Rule 37(c)(1), Plaintiff respectfully requests the following sanctions against Defendants:

1. Monetary Sanctions of $10,000,000 for Bad-Faith Litigation Conduct

Defendants' misconduct has:

- Prolonged this case unnecessarily.

- Forced Plaintiff to conduct independent investigations to obtain critical evidence.

- Caused severe financial and emotional harm to Plaintiff and her family.

A $10,000,000 sanction is necessary to:

- Compensate Plaintiff for the damage caused by these bad-faith delays.

- Deter future government misconduct in similar cases

- Hold Defendants accountable for misleading the Court and violating procedural obligations.

## 2. Adverse Inference Against Defendants

The Court should issue an adverse inference ruling that:

• Presumes Defendants intentionally withheld the DiMartini declaration to avoid liability.

• Holds that all reasonable inferences about these terminations should be drawn against the government.

## 3. Immediate Order for Expedited Discovery

Given this document suppression, Plaintiff requests immediate discovery into:

- All internal IRS and OPM communications related to these terminations.

- Emails, directives, and meeting records discussing the firing process.

- Any other suppressed evidence the government has not disclosed.

4. Court-Ordered Evidence Preservation Injunction

Plaintiff requests an injunction prohibiting Defendants from deleting, altering, or failing to produce additional documents related to these terminations.

## VI. CONCLUSION

Defendants had a clear duty to disclose this critical document. Their failure to do so—whether intentional or negligent—has prejudiced Plaintiff, misled the Court, and prolonged litigation.

Plaintiff respectfully requests that the Court grant this Motion for Sanctions, impose a $10,000,000 penalty against Defendants, and order immediate discovery into further suppressed evidence.

Defendants have engaged in bad faith litigation by deliberately withholding key evidence while relying on misleading procedural arguments to evade accountability. Their failure to disclose the DiMartini Declaration was not an oversight—it was an intentional act to mislead this Court and suppress the truth about the wrongful terminations at issue.

Now that the truth has been uncovered, Defendants must face the consequences. Plaintiff urges the Court to grant sanctions, compel discovery, and reject Defendants' bad-faith procedural tactics.

Defendants created this problem by suppressing evidence. Now, they must pay for it.

## XV. CONCLUSION AND PRAYER FOR RELIEF

Defendants have failed to provide any substantive justification for their unlawful termination of Plaintiff and instead attempt to hide behind procedural technicalities to avoid addressing the constitutional violations at the heart of this case. Their arguments regarding CSRA exclusivity, lack of a property interest, and absence of irreparable harm are legally and factually flawed.

The delay in ruling on Plaintiff's TRO has allowed Defendants to mount a defense that would not have existed had the Court acted in a timely manner. This Court must not permit procedural inefficiency to become a weapon against justice. Allowing the government to benefit from these delays by shielding itself behind process-based defenses only incentivizes further abuse of power.

Furthermore, the lack of transparency regarding the IRS's mass termination directive necessitates expedited discovery to determine whether these firings were truly neutral workforce reductions or a strategic downsizing designed to eliminate specific employees or departments.

Given these circumstances, Plaintiff respectfully requests that this Court:

1. GRANT Plaintiff's Motion for a Temporary Restraining Order (TRO), reinstating her employment or enjoining Defendants from continuing their unlawful termination practices until full judicial review is completed.

2. ORDER expedited discovery to investigate the scope, implementation, and targeting of the IRS's mass termination directive, including:

   • A breakdown of terminated employees by department, role, and classification status;

   • Internal IRS communications related to the decision-making process behind these terminations;

   • The financial or operational justifications, if any, for these firings;

   • Any documented selection criteria used to determine which employees were removed.

3. GRANT injunction for preservation of evidence.

4. GRANT requested sanctions and adverse inference

5. REJECT Defendants' procedural defenses, which rely on an unjustified delay to evade substantive review.

6. REQUIRE the government to provide a justification for the delay in ruling on Plaintiff's TRO, or alternatively, rule in Plaintiff's favor given that the delay has already caused irreparable harm.

7. GRANT any additional relief this Court deems just and proper to remedy the ongoing harm inflicted upon Plaintiff due to the IRS's unlawful actions and the Court's delay in granting emergency relief.

Expedited Discovery as a Corrective Measure for Procedural Delay

The Court cannot allow Defendants to leverage the delay as a shield while simultaneously denying Plaintiff access to discovery that could reveal critical information about the true nature of these terminations.

Under Rule 26(d)(1) of the Federal Rules of Civil Procedure, courts have discretion to order expedited discovery when procedural delays have prejudiced a plaintiff's ability to litigate effectively. Courts have granted expedited discovery in cases where:
• Government delays have unfairly allowed a defendant to obscure evidence or manipulate the litigation process (Centeno-Bernuy v. Perry, 302 F. Supp. 2d 128, 135 (W.D.N.Y. 2003)).
• A plaintiff presents evidence suggesting discrimination or retaliation, requiring transparency from the government (McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).
• Equitable tolling applies to prevent procedural delays from unfairly harming a plaintiff's ability to obtain relief (Holland v. Florida, 560 U.S. 631 (2010)).

If Defendants refuse to provide these records or fail to demonstrate that the terminations were conducted in good faith, the Court should draw an adverse inference that these terminations were not uniformly applied and were, in fact, retaliatory or selectively enforced.

Condemning Argument Against the Government's Exploitation of Procedural Delays

The audacity of the government in this case cannot be overstated. Not only has the government brazenly argued that Plaintiff's claims should be dismissed due to an alleged lack of service—a deficiency that exists solely due to the systemic barriers and procedural gamesmanship erected by the Defendants—but they have also manipulated this Court's unwarranted and unexplained delay in ruling on the TRO to bolster their own position. The government now contends that reinstatement would be too burdensome because too much time has passed, a delay they themselves engineered by refusing to address the merits of the case and instead burying Plaintiff in layers of bureaucratic obfuscation.

This is a textbook example of bad faith litigation and procedural abuse. Defendants have not once engaged with the substance of Plaintiff's claims while withholding key evidence. Instead, they have stalled, obstructed, and now have the gall to claim that the very passage of time— caused by their own misconduct and this Court's failure to rule—is itself a reason to deny relief. This is not justice. This is not the rule of law. This is pure, calculated institutional oppression designed to exhaust and demoralize an individual litigant until they can no longer fight back.

The government also dares to argue that a mandatory injunction requiring reinstatement would demand a much higher standard of harm, as though the destruction of Plaintiff's financial security, the threat of eviction, and the blatant intimidation tactics used against her family by her landlord do not meet that threshold. What greater harm must befall Plaintiff before this Court will acknowledge the government's wrongdoing? Are we to wait until she and her three children are forced onto the streets? Are we to accept that a small family must be ground into nothingness

while well-paid government attorneys sit comfortably in their offices and pontificate over procedural formalities?

If this Court rewards such vile and cynical litigation tactics, it will set a dangerous precedent that government actors may abuse procedural delays with impunity, knowing that the courts will ultimately shield them from accountability. The Court must not allow the Defendants to reap the benefits of their own obstruction. To do so would not only be an egregious miscarriage of justice but a flagrant endorsement of weaponized bureaucracy against the powerless. The time for inaction has ended. The Court must grant immediate discovery, issue an injunction to preserve evidence, and rule in favor of Plaintiff's TRO without delay.

This Court was established to ensure justice, not to serve as an instrument of bureaucratic oppression.  It must now decide whether it will uphold the rule of law or allow its own inaction to facilitate government abuse.

Defendants' reliance on procedural evasion must not be rewarded. The harm to Plaintiff has already been compounded by procedural inefficiency, financial instability, and retaliation. This Court has a constitutional obligation to ensure that due process violations are not permitted to persist unchecked.

For these reasons, immediate intervention is necessary, and the Court must act without further delay to rectify the injustice inflicted upon Plaintiff.

Respectfully submitted,


Rebecca Thornock

Pro Se Plaintiff

*Rebecca J. Thornock*

March 12th, 2025